Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISS LAW**
1801 Century Park East, 24th Fl.
Los Angeles, CA 90067
Telephone: (310) 208-2800
Facsimile: (310) 209-2348

*Counsel for Plaintiff*

[Additional Counsel in Signature Block]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA WOLFSON, derivatively on behalf of RIVIAN AUTOMOTIVE, INC., | Case No. 8:25-cv-2820 |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| ROBERT J. SCARINGE, CLAIRE MCDONOUGH, KAREN BOONE, SANFORD SCHWARTZ, ROSE MARCARIO, PETER KRAWIEC, JAY FLATLEY, JOHN KRAFCIK, AIDAN GOMEZ, and PAMELA THOMAS-GRAHAM, | [REDACTED VERSION OF COMPLAINT PROPOSED TO BE FILED UNDER SEAL] |
| Defendants, | **DEMAND FOR JURY TRIAL** |
| and | |
| RIVIAN AUTOMOTIVE, INC., | |
| Nominal Defendant. | |

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ......................................................................... 1

II.   JURISDICTION AND VENUE .................................................................... 4

III.  PARTIES ...................................................................................................... 5

  A.  Plaintiff ................................................................................................... 5

  B.  Defendants .............................................................................................. 5

    1.  Nominal Defendant Rivian ............................................................... 5

    2.  Individual Defendants ....................................................................... 5

IV.   THE INDIVIDUAL DEFENDANTS' DUTIES .......................................... 7

  A.  Additional Duties Under Rivian's Corporate Governance Guidelines ............................... 8

  B.  Additional Duties Under Rivian's Code Of Business Conduct .................... 8

  C.  Additional Duties Of Audit Committee Members ..................................... 10

  D.  Additional Duties Of Nominating And Governance Committee Members ..................... 10

  E.  Additional Duties Relating To The Prevention Of Discrimination.................... 10

V.    SUBSTANTIVE ALLEGATIONS ............................................................ 12

  A.  Background ............................................................................................ 12

  B.  Rivian's Base Models Are Unrealistically Priced And Delivery Dates Are Set To Beat Competitors ...................... 12

  C.  The Board And Management Knew The Vehicles Were Severely Underpriced, Leading To Substantial Operational Losses ...................... 14

    1.  The Board knew that pricing was causing substantial operational losses .................... 14

    2.  Internal tracking systems showed substantial operational losses caused by underpricing 14

    3.  Laura Schwab's warnings about underpricing.................... 15

    4.  Failed cost reduction efforts.................... 15

    5.  In September 2021, ██████████████████████ .......... 16

  D.  Rivian's IPO .......................................................................................... 16

  E.  The Board Knew The Material Risks Regarding Rivian's Core Operations .................... 17

  F.  Representations Regarding Rivian's Competitive Strengths And Expansion To Meet Demand .................... 19

  G.  Rivian Falls Short On Vehicle Production And Raises Prices ........................... 23

  H.  Market Reaction To Price Increase Announcement.................... 26

  I.  Analyst Commentary Regarding The True Nature Of The Problem .................. 27

  J.  Rivian Reports Substantial Losses .......................................................... 28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

K.   Rivian Is Sued In A Securities Class Action Lawsuit ............................................ 30

   1.   Confidential witnesses in the Securities Class Action confirm Rivian's knowledge that underpricing was causing substantial operating losses .......................................... 31

   2.   The Court denies defendants' motions to dismiss the Securities Class Action ........... 32

   3.   The Securities Class Action settles for $250 million .................................................. 33

L.   The Board Ignored Red Flags Regarding Operational Issues And Underpricing ............. 33

M.   The Company Continues To Misrepresent Its Operational Capabilities .......................... 35

N.   Rivian's False And Misleading Proxy Statement .......................................................... 42

O.   Rivian Announces Flat 2024 Production Guidance ....................................................... 43

P.   Rivian Is Sued In Another Securities Class Action Lawsuit .......................................... 44

VI.    DERIVATIVE AND DEMAND ALLEGATIONS ......................................................... 45

VII.    CLAIMS FOR RELIEF .................................................................................................. 46

VIII.    PRAYER FOR RELIEF .................................................................................................. 51

IX.    JURY DEMAND ............................................................................................................. 52

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Barbara Wolfson, by the undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Rivian Automotive, Inc. ("Rivian" or the "Company") against former and current members of the Board of Directors of the Company (the "Board") and the Company's Chief Financial Officer ("CFO") (collectively, the "Individual Defendants") for their breaches of fiduciary duties and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of internal documents produced by the Company to Plaintiff in response to a request to inspect certain books and records to assess claims against the Board, as outlined in Plaintiff's August 31, 2022 litigation demand to Rivian, a review of Rivian's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), securities class action lawsuits filed against the Company and its directors and officers, corporate governance documents published on the Company's website, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

# I.     NATURE OF THE ACTION

1.     This is a stockholder derivative action brought against current and former members of Rivian's Board and its CFO for breaches of fiduciary duty, violations of Sections 14(a) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), and other misconduct, which resulted in substantial damage to the Company and its stockholders, including $850 million in operational losses, substantial lost revenues from frustrated customers, and a $250 million settlement in a related securities class action, with ongoing litigation exposure. Plaintiff brings this action to recover these damages from the Individual Defendants for Rivian since her demand upon the Board to bring these claims has been refused as evidenced by its three year, ongoing delay in responding to the demand.

2.     Rivian went public through an IPO completed on November 10, 2021, raising $13.7 billion from investors—the seventh largest IPO in U.S. history. A key premise of Rivian's IPO valuation was its promise of feature-packed electric vehicles at retail prices that were highly

competitive with established competitors, including Tesla, Inc. ("Tesla"), which at the time was a dominant player in the market.  Indeed, in the Company's filings in connection with the IPO, a majority of the Defendants represented that the Company had competitive advantages, was expanding to meet demand, and had built a "robust infrastructure" to scale production. The Company set base prices of $67,500 for its R1T electric pickup truck and $70,000 for its R1S electric SUV in order to be competitive with Tesla. These competitive prices drove over 55,000 pre-orders and was touted to justify the Company's massive valuation in the IPO.

3.     However, dating back to 2019—two years before the IPO—the Board was advised through internal tracking systems, cost estimates, and warnings by an experienced Rivian executive about underpricing that would lead to operational losses and quality concerns. Indeed, cost consultants ultimately confirmed that the cost of the bill of materials for R1 vehicles was at least $110,000, far exceeding the $67,500 retail price. This meant Rivian would lose approximately $40,000 to $42,500 on every vehicle sold, even before accounting for fixed costs, labor, or overhead. Early cost reduction efforts had failed, with virtually no wiggle room to increase margins. The Board knew that substantial price increases were necessary to avoid substantial losses and to turn a profit, because the material costs alone exceeded the selling prices. Yet the Company's IPO filings and subsequent public statements misled investors by suggesting that the reported operational losses in the offering materials were primarily due to fixed costs spread across a small production base, and that the Company would achieve positive gross profits through production scaling.

4.



5.     On November 4, 2021—one day before the final IPO registration statement was filed and six days before the IPO—Laura Schwab, Rivian's Vice President of Sales and Marketing with over 20 years of automotive industry experience, filed a lawsuit alleging gender discrimination,

retaliation, and wrongful termination. The lawsuit detailed that Ms. Schwab had warned since the Spring of 2021, months before the IPO, of the losses to be incurred through underpricing, the unrealistic manufacturing targets, and inadequately refined manufacturing processes, again putting the Board on explicit notice of serious problems that required they take action. Rather than investigating these allegations or delaying the IPO to address known issues, CEO Scaringe publicly dismissed Schwab's claims on the day of the IPO, and the Board authorized the Company to proceed with raising $13.7 billion from investors while concealing these material issues.

6. In furtherance of their cover-up of these fiduciary breaches, the Individual Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 by causing the Company to make materially false and misleading statements in proxy materials, omitting material facts about the Board's oversight failures, the Company's cost structure, and the impossibility of achieving profitability without price increases.

7. About five months after the IPO, on March 1, 2022, Rivian announced substantial price hikes on its R1T and R1S, 17% and 20%, respectively, including the over 71,000 existing pre-orders. The announcement triggered immediate public outrage, customer accusations of "bait and switch," and a stock price collapse of 47%, falling from $67.56 to $35.83 per share. Within 48 hours, the Board was forced to partially reverse course, agreeing to honor original prices for existing pre-orders, but the damage was done.

8. Securities class action lawsuits were swiftly filed against Rivian and certain of its directors and officers, consolidated under *Crews v. Rivian Automotive, Inc., et al.*, No. 2:22-cv-01524-JLS-E (C.D. Cal.) (the "Securities Class Action"). In October 2025, Rivian agreed to pay $250 million to settle that Securities Class Action – including an out-of-pocket payment of $183 million from the Company beyond the $67 million paid by existing director & officer insurance policies. The Company still faces a second securities class action lawsuit alleging continued misrepresentations about vehicle demand, inflation impacts, and production ramp-up. Revenue losses, cancelled pre-orders, decreased demand in the long-term due to the material price hikes, reputational harm, and damage to the Company's credibility with consumers and investors continue to mount.

9.      Through this derivative action, Plaintiff seeks to recover the massive sustained by Rivian from the Individual Defendants whose breaches of fiduciary duty and other misconduct resulted in this damage to the Company.

10.     Plaintiff made a pre-suit demand on the Board on August 31, 2022, requesting that the Board take action to remedy the misconduct alleged herein. More than three years have elapsed, but the Board has not brought the demanded claims. Under Delaware law, the Board's failure to take action within this time period constitutes a refusal of the demand.  The failure to take action within three-years of Plaintiff's demand, let alone to provide a substantive response to Plaintiff's demand in that time frame, is unjustified and does not reflect a valid exercise of business judgment.  The refusal of Plaintiff's demand was wrongful, and without this action Rivian's substantial damages will not be recovered.

## II.    JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) and Section 21D of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This Court has jurisdiction over each Defendant named herein because Rivian maintains its headquarters and does substantial business in this District and, as such, each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

13.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), where the Company maintains its headquarters and where it conducts substantial business.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## III.   PARTIES

### A.   Plaintiff

15.   Plaintiff Barbara Wolfson purchased Rivian stock in the Company's IPO and has held Rivian stock continuously since then.   As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B.   Defendants

#### 1.   Nominal Defendant Rivian

16.   Rivian is a Delaware corporation with its principal executive offices located at 14600 Myford Road, Irvine, California 92606. Rivian shares trade on the Nasdaq stock market ("Nasdaq") under the ticker symbol "RIVN."

#### 2.   Individual Defendants

17.   Defendant Scaringe ("Scaringe") is the founder of Rivian.   He is the CEO and a Rivian director since 2009 and serves as Chairman of the Board since 2018.   Since 2023, Scaringe received the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2024 | $1,000,000 | $9,359,393 | $3,896,573 | $294,231 | $342,018 | $14,892,215 |
| 2023 | $759,038 | $6,065,409 | $7,173,658 | $277,611 | $78,364 | $14,354,080 |

18.   Defendant McDonough ("McDonough") is the CFO of Rivian since January 2021. Since 2023, McDonough received the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2024 | $450,000 | $5,398,207 | $2,248,022 | $67,500 | $8,200 | $8,171,929 |
| 2023 | $450,000 | $2,022,009 | $2,391,235 | $164,250 | $19,083 | $5,046,577 |

19.   Defendant Karen Boone ("Boone") is a Rivian director since August 2020, Chair of the Audit Committee, and a member of the Compensation Committee.   Boone is also on the board of Peloton Interactive, Inc. ("Peloton").   Since 2023, Boone received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $110,000 | $266,948 | $376,948 |
| 2023 | $110,000 | $287,327 | $397,327 |

20.     Defendant Sanford Schwartz ("Schwartz") is a Rivian director since 2019, Chair of the Compensation Committee, and a member of the Plant and Policy Committee. Schwartz has served in several positions at Cox Enterprises, Inc, ("Cox"), including most recently as CEO of the Cox Family Office since January 2021. Cox, through its affiliate Manheim Investments, Inc. ("Manheim"), is one of the largest shareholders of Rivian. Since 2023, Schwartz received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $77,500 | $275,986 | $353,486 |
| 2023 | $77,500 | $281,076 | $358,576 |

21.     Defendant Rose Marcario ("Marcario") is a Rivian director since 2021, Chair of the Plant and Policy Committee, and a member of the Nominating and Governance Committee.  Since 2023, Marcario received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $80,048 | $276,295 | $356,343 |
| 2023 | $72,500 | $280,617 | $353,117 |

22.     Defendant Peter Krawiec ("Krawiec") is a Rivian director since 2019.  Since 2007, Krawiec has served in various leadership roles at Amazon.com., Inc. ("Amazon"), including as Vice President of Worldwide Corporate and Business Development since March 2021.  Amazon is the largest shareholder of Rivian. Since 2023, Krawiec received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $50,000 | $272,771 | $322,771 |
| 2023 | $50,000 | $275,794 | $325,794 |

23.     Defendant Jay Flatley ("Flatley") is a Rivian director since 2021 and a member of the Audit Committee and the Compensation Committee. Since 2023, Flatley received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2024 | $71,683 | $266,948 | $338,631 |
| 2023 | $70,000 | $266,201 | $336,201 |

24.     Defendant John Krafcik ("Krafcik") is a Rivian director since July 2023 and is Chair of the Nominating and Governance Committee and a member of the Audit Committee. Since 2023, Krafcik received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------------------------------|--------------|-------|
| 2024 | $72,596 | $266,948 | $339,544 |
| 2023 | $26,155 | $391,089 | $417,244 |

25.     Defendant Aidan Gomez ("Gomez") is a Rivian director since April 2025.

26.     Defendant Pamela Thomas-Graham ("Thomas-Graham") was a Rivian director from 2021 to June 2024 and was Chair of the Nominating and Governance Committee and a member of the Audit Committee during that time.  Thomas-Graham is also on the board of Peloton. Since 2023, Thomas-Graham received the following compensation:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------------------------------|--------------|-------|
| 2024 | $30,707 | N/A | $30,707 |
| 2023 | $75,408 | $281,076 | $356,484 |

27.     Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Krawiec, Flatley, Krafcik, Gomez, and Thomas-Graham are collectively referred to as the "Individual Defendants."

## IV.     THE INDIVIDUAL DEFENDANTS' DUTIES

28.     By reason of their positions as officers or directors of Rivian and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe to Rivian and its stockholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Rivian in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Rivian and its stockholders to benefit all stockholders equally and not in furtherance of their own personal interests or benefit.

29.     The Individual Defendants, because of their positions of control and authority as directors and officers of Rivian, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

30.     As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the Nasdaq, the Individual Defendants also

owed a duty to ensure the reporting of accurate, complete, and truthful information concerning Rivian's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Rivian's management, policies, and internal controls.

31.    At all times relevant hereto, the Individual Defendants were the agents of each other and Rivian and were always acting within the course and scope of such agency.

32.    The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Rivian.

**A.    Additional Duties Under Rivian's Corporate Governance Guidelines**

33.    Rivian's Corporate Governance Guidelines require that its directors, *inter alia*:

- Exercise their business judgment in good faith;

- Act in the best interest of all stockholders;

- Become and remain well-informed about the Company's business and operations and general business and economic trends affecting the Company; and

- Ensure that the business of the Company is conducted to further the long-term interests of its stockholders.

**B.    Additional Duties Under Rivian's Code Of Business Conduct**

34.    Rivian's Code of Business Conduct and Ethics ("Code of Conduct") applies to "all directors, officers, leaders, and employees."

35.    The Code of Conduct emphasizes the Company's commitment to ethical business practices:

> It is core to who we are as a company to conduct business ethically and in compliance with the law. This is the right thing to do, builds trust with our customers and helps us avoid situations that might lead to adverse legal consequences or damage to our hard-earned reputation. This Code . . . sets forth the expectations for how we do business. It's what we stand for and what we expect from ourselves, each other, and those with whom we do business.

36.    The Code of Conduct urges employees to speak up about violations of the Code of Conduct:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Let us know if you witness or experience any potential violations of our Code. When you speak up, you're helping everyone at Rivian. You have an obligation to raise a concern if you hear or see anything unusual or questionable. Reach out via our Rivian Ethics Hotline at 1-844-986-1441 or through our dedicated website at www.rivian.ethicspoint.com.

37.    The Code of Conduct stresses the need to maintain accurate records:

Accurate recordkeeping and reporting are necessary to meet accounting, legal and regulatory requirements. Maintaining financial integrity is essential and reflects positively on our reputation and credibility. As a public company, Rivian is subject to various securities laws, regulations, and reporting obligations. Both U.S. federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations, and inaccurate, incomplete or untimely reporting can severely damage the Company and result in legal liability. Each of us—at every level—has a responsibility for ensuring the accuracy of all Company business and financial records.

From quality assurance records, budget forecasts, and regulatory filings, to emails, timesheets, benefit claim forms, and expense reports, we all handle Company records. Be sure to follow all internal processes, record retention requirements, policies, and generally accepted accounting principles so that our records accurately reflect all transactions. Be honest, accurate, timely, and complete in everything you record.

38.    The Code of Conduct highlights the importance of building transparent customer relationships:

Our suppliers, customers, and other business partners place a great deal of trust in our brand, and we are determined to never let them down. We see them as true partners, and they are essential to Rivian's continued growth and success. Building relationships with suppliers, customers, and other business partners is an ongoing process and requires an enduring commitment to high standards of business conduct. In every interaction we have with these third parties, we must demonstrate honesty and a commitment to our values. ***Just one deceptive or dishonest act can seriously damage a relationship.[1]***

\*\*\*

***Everything we tell our customers, suppliers, and other business partners must be truthful***, including our advertising and other communications. Do not engage in any unfair, deceptive, or misleading practices.

\*\*\*

Deal honestly and fairly with our customers. Be truthful about Rivian and what we sell. ***Do not make any claims the Company cannot support or substantiate***.

---

[1] All emphasis is added unless otherwise stated.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

### C.    Additional Duties Of Audit Committee Members

39.    The members of the Company's Audit Committee have additional duties outlined in the Audit Committee Charter, including requirements that its members:

- Review with management the Corporation's major financial risk and enterprise exposures and the steps management has taken to mitigate such exposures, including the structure, design, adoption, and implementation of the Corporation's risk management policies and internal control systems.

- Review the scope of the internal and independent auditors' assessment of internal control over financial reporting and obtain reports on any significant deficiencies and/or material weaknesses, together with recommendations and management's responses.

- Coordinate the Board of Directors' oversight of the Corporation's Code of Business Conduct and Ethics and monitor the procedures in place to enforce the Code.

### D.    Additional Duties Of Nominating And Governance Committee Members

40.    The members of the Company's Nominating and Governance Committee have additional duties outlined in the Nominating and Governance Committee Charter, including requirements that its members:

- Develop and recommend to the Board of Directors a set of corporate governance guidelines applicable to the Corporation, review such guidelines from time to time as the Nominating and Governance Committee deems appropriate, and recommend any necessary or appropriate changes to the Board of Directors.

- Oversee the Corporation's corporate governance practices and procedures, including identification of best practices, review, and recommendation to the Board of Directors for approval of any changes to the documents, policies, and procedures in the Corporation's corporate governance framework, including its certificate of incorporation and by-laws.

### E.    Additional Duties Relating To The Prevention Of Discrimination

41.    The Company's Code of Conduct stresses that "[f]ollowing local, state and federal laws is fundamental to how we do business at Rivian.…  Laws touch all aspects of our business at Rivian, from how we make, market, promote, and sell our vehicles, *to how we treat one another.* Each one of us is individually accountable for respecting and following the laws everywhere where we operate."

42.    In a section entitled "We Collaborate Respectfully," the Code of Conduct emphasizes every Rivian director, officer, and employee's obligation to promote a non-discriminatory culture:

> We do not tolerate discrimination or harassment in any form, including any conduct or comments *that* create, encourage, or permit an offensive or intimidating work environment.  This includes verbal or physical harassment; racism; sexism;

-10-

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

bullying; sexual harassment; retaliation; inappropriate humor; mistreatment of others based upon their personal characteristics, beliefs, or membership in a protected class, or other actions that offend or cause distress. Everyone at Rivian is entitled to work in an environment that is free of harassment, bullying, discrimination, and retaliation.

Promote fairness, diversity, and inclusion. Each person is a key player on our team, deserving of respect. Demonstrate that you appreciate others' varied backgrounds, skills, and cultures. Never single anyone out for negative treatment and be fair in all employment decisions. Base your decisions on factors like skills, qualifications, performance, and business needs—never on personal characteristics, national origin, ethnicity, military status, or religious beliefs.

\*\*\*

If you see, experience, or suspect harassment or discrimination, speak up about it. You can speak directly to the person or through your manager. Your People Partners or the Legal Team are also available to provide guidance. You may also make a report using the Rivian Ethics Hotline.

43. The Code of Conduct warns that "[i]t is not enough for managers and supervisors to just understand and adhere to the Code. You also have an obligation to inspire others to act with integrity and serve as a resource for employees with questions or concerns."

44. Title VII of the Civil Rights Act of 1964 ("Title VII") is a federal law that prohibits discrimination in employment on the basis of sex, race, color, national origin, and religion, and it applies to employers, like Rivian, with 15 or more employees. Title VII also makes it illegal to retaliate against a person who complains about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit. Likewise, employment discrimination is prohibited in jurisdictions around the country where Rivian operates its businesses, where the alleged conduct took place, and where Rivian is incorporated. *See* Del. Code Ann. tit. 19, § 711A (2019).

45. The Individual Defendants' fiduciary duties require them to monitor the Company's compliance, reputational, and ethics risks. These risks include acts that may violate Title VII, state anti-discrimination, anti-retaliation laws, and the Company's Code of Conduct. The Company's fiduciaries have a duty to act promptly when presented with credible evidence of misconduct occurring within the Company's executive ranks: they must address leaders' wrongdoing; guard employees from retaliation and further abuse; and protect the Company's public image. The

Individual Defendants, based on their fiduciary duties, must avoid violating anti-discrimination and anti-retaliation laws through their actions on behalf of the Company.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

46.    Rivian was founded in 2009 by Defendant Scaringe under the name Mainstream Motors. In January 2017, the Company purchased a former Mitsubishi manufacturing plant in Normal, Illinois, a pivotal milestone toward the goal of becoming a full-scale auto manufacturer.  In December 2017, Rivian announced its plans to produce an electric truck and SUV (later called the R1T and R1S) in 2020 and 2021, respectively, with both vehicles built on an in-house platform and featuring autonomous driving capabilities.

### B.    Rivian's Base Models Are Unrealistically Priced And Delivery Dates Are Set To Beat Competitors

47.    In 2018, the Company launched a publicity campaign regarding its base models, offering media exclusive previews that touted luxury-level performance, off-road capabilities, and battery ranges of 200–450 miles. The campaign generated significant media buzz and culminated in the debut of Rivian's concept vehicles at the November 2018 LA Auto Show, marking its transition from a stealth startup to a high-profile EV contender.

48.    At the LA Auto Show, Rivian introduced the R1T and R1S as electric "adventure vehicles," with a range of more than 400 miles and other unique features. Rivian stressed that the vehicles offered a balance of rugged utility and high-end comfort, with interiors benchmarked against luxury automakers. Initial retail pricing was set at $69,000 and $72,500 for the base R1T and R1S, respectively. These initial low prices for high-quality EVs loaded with powerful specs were met with extreme excitement in the auto industry. *ElectricCarsReport* called the base prices "a steal," particularly given their long range and luxury positioning.[2] *MotorTrend* echoed that opinion, noting that many modern half-ton trucks already cost more than $60,000 and concluding that the R1T "might

---

[2]  Press Release, All-Electric Rivian R1S Debuts at LA Auto Show, (Nov. 28, 2018), https://electriccarsreport.com/2018/11/all-electric-rivian-r1s-debuts-at-la-auto-show.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

be something of a bargain."[3] Similarly, *Curbside Classic* emphasized that Rivian's top battery option would deliver "over 410 miles on a single charge," a spec that surpassed most electric SUVs at the time.[4]

49.     On February 15, 2019, the Company disclosed a partnership with Amazon with a $700 million investment by the retail giant into Rivian "inspired" by the Company's vision for EVs.  A few days later, on a public relations tour, Defendant Scaringe noted that the Company was being careful to "underpromise and overdeliver" with regards to the R1T and R1S. When confronted on the pricing for Rivian's vehicles, Scaringe emphasized that the vehicles were deliberately positioned at the premium end of the market, targeting high end vehicle buyers based on the R1T and R1S's performance, advanced self-driving and connectivity, and large battery capacity.

50.      However, in early 2020, in response to Tesla's aggressive pricing for its Cybertruck, with a base price of only $39,000, Rivian lowered the prices for its base model R1T and R1S. In particular, the original pricing was qualified as the retail prices of "well-equipped" vehicles, not base models.

51.     In April 2020, Rivian announced that customer deliveries of the R1T and R1S would be postponed until 2021, attributing the delay to COVID-related shutdowns that stalled construction at its Normal, Illinois plant. In a July 2020 email to customers, Defendant Scaringe confirmed that Rivian expected to launch R1T deliveries in June 2021, followed by R1S deliveries in August 2021.

52.     The Company's first customer vehicle was only produced on September 14, 2021. The Company attempted to ramp up production, but only produced 12 R1Ts by September 30, 2021.

53.     In November 2020, the Company officially set its R1T and R1S base prices at $67,500 and $70,000, respectively.

---

[3] Jason Gonderman, *Rivian Reveals All-Electric R1T Concept Pickup Before 2018 Los Angeles Auto Show* (Nov. 26, 2018), https://www.motortrend.com/news/1811-rivian-reveals-all-electric-r1t-concept-pickup-before-2018-los-angeles-auto-show.

[4] Paul Niedermeyer, *Industry News: The Rivian R1S Looks Ready to Shake Up the Three-Row Luxury SUV Segment* (Nov. 28, 2018), https://www.curbsideclassic.com/blog/news/industry-news-the-rivian-r1s-looks-ready-to-shake-up-the-three-row-luxury-suv-segment.

-13-
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

54.     On December 20, 2021, Rivian announced that it had finally delivered its first two R1Ss, which were sent to Defendants Scaringe and McDonough.

**C.     The Board And Management Knew The Vehicles Were Severely Underpriced, Leading To Substantial Operational Losses**

55.     By September 2021, the actual cost of the bill of materials for R1 vehicles was at least $110,000, far exceeding the retail prices of $67,500 for the R1T and $70,000 for the R1S, meaning Rivian would lose money on every vehicle sold, regardless of production volume or economies of scale.

**1.     The Board knew that pricing was causing substantial operational losses**

56.     By 2019, Rivian learned that its original retail prices were based on erroneous and materially understated cost estimates from 2018. In December 2019, CFO Ryan Green convened a meeting with the Finance Director and members of the Cost Engineering Group to assess the validity of the consultant's cost estimates. This meeting revealed that the consultant had understated actual costs by 20-30%.

57.     Rather than heed this warning, shortly after the December 2019 meeting, Rivian terminated the external consultant and brought cost engineering in-house.

58.     By 2020, the in-house Cost Engineering Group confirmed what the Individual Defendants already knew, *i.e.*, that the bill of materials exceeded $100,000 per vehicle. By September 2021, all parts had been sourced and material costs were locked in at a minimum of $110,000 per vehicle through purchase orders with suppliers, reflecting the Individual Defendants' knowledge that when pricing was set in November 2021, that it would result in a loss of $40,000-$42,500 per vehicle sold before considering fixed costs.

**2.     Internal tracking systems showed substantial operational losses caused by underpricing**

59.     Rivian maintained internal systems that tracked and reported the underpricing problem to senior executives and the Board. The Cost Engineering Group used a database called "Project X" that tracked all R1 Platform material costs. Executives, including Defendant Scaringe, had access to Project X and could view the detailed material costs that exceeded the retail prices of the vehicles.

According to the allegations in the Class Action, Project X revealed that Rivian's material costs for its R1 vehicles surpassed $100,000 per unit by 2020, exceeding their retail prices at the time by $30,000 to $40,000.

60.     The Finance team prepared a "Revenue and Margins Report," an internal company forecast that used data from Adaptive Insights and was integrated into Tableau reports, which were part of Rivian's internal financial reporting systems and were accessible to executives. This report was regularly presented to the Commercial Finance team in meetings attended by finance managers in Fall 2021, showing that Rivian would continue to operate at negative gross margins at current pricing levels.

### 3.   Laura Schwab's warnings about underpricing

61.     Beginning in Spring 2021, Laura Schwab, Rivian's Vice President of Sales and Marketing, began raising alarms about the Company's underpriced vehicles. Schwab had over 20 years of experience in the automotive industry, including serving as the first female President in Aston Martin Lagonda's 105-year history, and had substantial experience launching and pricing vehicles.

62.     Schwab warned that each vehicle sale would result in a loss to the Company. She raised this issue with several executives, including Chief Growth Officer Jiten Behl, her immediate superior. Despite her extensive automotive experience, Schwab's concerns were dismissed.

63.     In Fall 2021, Schwab worked with Finance Director Dennis Lucey to develop projections showing the losses Rivian would incur if prices were not raised. These quantified projections were shared with management.

64.     When Schwab escalated her concerns and a male executive also raised the underpricing issue, Chief Growth Officer Behl admitted that the Company would need to raise prices after the IPO.

### 4.   Failed cost reduction efforts

65.     The Cost Engineering Group proposed cost reductions on a monthly basis, but according to members of that group, "nothing was ever really done" to implement meaningful cost savings.

66. For example, the Cost Engineering Group identified proposed cost reductions of $2,000 for the vehicle interior. However, only approximately $800 in cost reductions was realized because Defendant Scaringe personally wanted actual wood for R1 interiors and rejected proposals to eliminate wood from the vehicle interiors.

67. Once production began, it became difficult to change suppliers or reduce costs because materials were sourced prior to production and purchase orders locked in costs. By September 2021, all materials had been sourced and costs were locked in.

**5. In September 2021,**



68.

69.

70.

**D.    Rivian's IPO**

71. On October 1, 2021, Rivian filed a Registration Statement with the SEC for its IPO (the "IPO Registration Statement"), which was signed by Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham. On November 12, 2021, Rivian filed with the SEC a Prospectus for the IPO (the "IPO Prospectus"), which was signed by Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham. In the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

IPO, the Company initially sold approximately 153,000,000 shares of common stock at $78.00 per share, raising approximately $11.9 billion in proceeds. After the full exercise of the underwriters' over-allotment option, the total gross proceeds from the offering increased to approximately $13.7 billion.

72. In the IPO Registration Statement, the Company revealed an anticipated 2023 delivery date for preordered R1T and R1S vehicles:

> As of October 31, 2021, we had approximately 55,400 R1T and R1S preorders in the United States and Canada from customers who each paid a cancellable and fully refundable deposit of $1,000.  Based on our current production forecast, we expect to fill our preorder backlog of approximately 55,400 R1 vehicles by the end of 2023.

**E.    The Board Knew The Material Risks Regarding Rivian's Core Operations**

73. The IPO Materials demonstrate that the Board was well aware of the risks relating to Rivian's reliance on preordering:

> Preorders for our vehicles are cancellable and fully refundable
>
> Deliveries of the R1T began in September of 2021 and deliveries of the R1S are not expected to begin until December 2021 and may occur later or not at all. As a result, we offer waitlist preorders for consumers with a cancellable and fully refundable deposit of $1,000. Deposits paid to preorder the R1T and R1S are cancellable by the customer until the customer enters into a lease or purchase agreement. Because all of our preorders are cancellable, it is possible that a significant number of customers who submitted preorders for our vehicles may not purchase vehicles.
>
> The potentially long wait from the time a preorder is made until the time the vehicle is delivered, and any delays beyond expected wait times, could also impact consumer decisions on whether to ultimately make a purchase.  Any cancellations could harm our business, prospects, financial condition, results of operations, and cash flows.

74. The IPO Materials demonstrate that the Board was also aware of the risk to Rivian's business posed by supply chain issues and semiconductor chip shortages:

> We are dependent on our existing suppliers, a significant number of which are single or limited source suppliers and are also dependent on our ability to source suppliers, for our critical components, and to complete the building out of our supply chain, while effectively managing the risks due to such relationships.
>
> ***
>
> **We depend upon third parties to manufacture and to supply key semiconductor chip components necessary for our vehicles.  We do not have long-term agreements with all of our semiconductor chip manufacturers and suppliers, and if these manufacturers or suppliers become unwilling or unable**

**to provide an adequate supply of semiconductor chips, with respect to which there is a global shortage, we would not be able to find alternative sources in a timely manner and our business would be adversely impacted.**

\*\*\*

We have in the past experienced, and may in the future experience, semiconductor chip shortages, and the availability and cost of these components would be difficult to predict. For example, our manufacturers may experience temporary or permanent disruptions in their manufacturing operations due to equipment breakdowns, labor strikes or shortages, natural disasters, component or material shortages, cost increases, acquisitions, insolvency, changes in legal or regulatory requirements, or other similar problems.

\*\*\*

***We may experience significant delays in the design, manufacture, financing, regulatory approval, launch and delivery of our vehicles, which could harm our business, prospects, financial condition, results of operations, and cash flows.***

Our future business depends in large part on our ability to execute on our plans to develop, manufacture, market and sell our vehicles.  Our initial deliveries for the R1T and R1S were and are, respectively, delayed, and our production ramp is taking longer than originally expected due to a number of reasons. Although we have not experienced any material increase in cancellations of customer pre-orders to date, any further delay in the financing, design, manufacture, regulatory approval, launch or delivery of our vehicles could materially damage our brand, business, prospects, financial condition, results of operations, and cash flows, and could cause liquidity constraints. (Emphasis in original).

\*\*\*

Furthermore, we have no experience to date in high volume manufacturing of our vehicles and we cannot assure that we will be able to develop efficient, automated, low-cost manufacturing capabilities and processes, and reliable sources of component supply, that will enable us to meet the quality, price, engineering, design and production standards, as well as the production volumes, required to successfully market our vehicles as our operations expand. Any failure to effectively manage our growth could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

75.    The IPO Materials demonstrate that the Board was aware that Rivian had a material weakness in internal controls over financial reporting:

We have identified material weaknesses in our internal control over financial reporting.  If our remediation of such material weaknesses is not effective, or if we experience additional material weaknesses in the future or otherwise fail to develop and maintain effective internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.

76.    The IPO Materials stated that the material weaknesses "pertained to controls to address segregation of duties across financially relevant functions and information technology general controls over tools and applications used in financial reporting," which occurred because Rivian did

-18-

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

"not have the necessary business processes, systems, personnel and related internal controls necessary to satisfy the accounting and financial reporting requirements of a public company."

77.    The IPO materials further warned that if additional material weaknesses were discovered or if the company determined that the existing material weaknesses were not remediated then "***our management will be unable to assert that our internal control over financial reporting is effective,***" leading to a loss of investor confidence, affecting the Company's stock price, and opening the Company up to litigation and regulatory investigations.

78.    The IPO Materials contained materially false and misleading statements regarding Rivian's path to profitability. Specifically, the IPO Materials stated that Rivian would "generate positive gross profit as production utilization increases and we leverage our investments."

79.    At the time of this statement, the Board knew or should have known that the bill of materials cost alone exceeded retail prices, meaning no amount of scaling, increased production utilization, or leveraging investments could generate positive gross profits without substantial price increases. The Company could not achieve positive gross profit through production scaling when it was losing money on the materials for every vehicle sold.

80.    The IPO Materials also misleadingly attributed negative gross profits to the fact that "fixed costs from investments in vehicle technology, manufacturing capacity, and charging infrastructure are spread across a smaller product base." This representation implied that negative gross profits were primarily driven by fixed costs that would be absorbed as production scaled. In reality, Rivian would operate at negative gross profit per vehicle because the cost of materials alone exceeded the selling price. The Company omitted this material fact from the IPO Materials.

**F.    Representations Regarding Rivian's Competitive Strengths And Expansion To Meet Demand**

81.    In the IPO Materials, Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Krawiec, Flatley, and Thomas-Graham represented that the Company's production facility was equipped to produce up to 150,000 vehicles annually and would reach that capacity by late 2023:

> Our manufacturing facility in Normal, Illinois (the "Normal Factory") ***is currently equipped to produce up to 150,000 vehicles annually*** (distributed between the R1 platform, which will be used to produce the R1T and R1S, and the RCV platform, which will be used to produce EDVs and other commercial vehicles), when the

equipment is operated at full rate and on multiple shifts. The current annual installed capacity for the R1 platform and RCV platform is approximately 65,000 and 85,000 vehicles, respectively. . . .  Our target is to produce approximately 1,310 R1 vehicles a week, which when annualized (assuming 49.6 working weeks per year), equates to the current installed R1 platform capacity of approximately 65,000 R1 vehicles annually . . . . We expect our vehicle production rate will improve as we continue to increase the speed of the line, hire and train employees to run additional shifts, commence production of the R1S and EDVs, and increase the rate of purchased materials from our supply chain. We expect to reach a vehicle production rate, which, when annualized, would result in us using 100% of the facility's current installed capacity of up to 150,000 vehicles by late 2023.

82.    Based on these representations of production capacity, these directors and officers emphasized that Rivian expected to fill its "preorder backlog of approximately 55,400 R1 vehicles by the end of 2023."

83.    The IPO Materials emphasized the competitive advantages of Rivian, including customer loyalty as evidenced by a substantial number of preorders for its vehicles. The Company's growth was attributed to tailoring its vehicles for customer satisfaction and building direct customer relationships, the "***Rivian Advantage***": "Our direct relationships with customers allow us to gather insights, design solutions that best serve their needs, drive strong engagement, remove structural inefficiencies, create transparency, and increase customer satisfaction and referrals." To achieve long-term growth, the Company stressed that a key component was the ability to offer" additional vehicle variants ***across a broader set of price points supported by scale-driven supply chain efficiencies***, further vertical integration, and technology advancements."

84.    The IPO Materials described the Company's commitment to providing customers with an "exceptional experience" based on "intuitive digital tools and ***robust infrastructure***."

85.    The Company touted its R1 Platform as one that designed, developed, and manufactured "category-defining electric vehicles ('EVs') and accessories," noted that "a full suite of proprietary, value-added services" addressed the whole "vehicle lifecycle" and deepened Rivian's "customer relationships," and that the Company's "flagship products" were occupying "an attractive whitespace, addressing large, fast-growing, and high-margin market segments, and are designed to accelerate the large-scale adoption of sustainable transportation."

86.    In early November 2021, in a roadshow to promote the Company's R1 platform, Rivian made a presentation which touted the Company's R1S and R1T as first of their kind in their respective categories and emphasized the low starting prices for the base models.

87.



88.    On December 17, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q updating stockholders on its production progress and further expansion efforts to meet demand:

> In the consumer market, we launched the R1 platform with our first generation of consumer vehicles, the R1T, a two-row five-passenger pickup truck, and the R1S, a three-row seven-passenger sport utility vehicle ("SUV"). As of September 30, 2021, we produced 12 R1Ts and delivered 11 R1Ts, and as of December 15, 2021, we have produced 652 and delivered 386 R1 vehicles, including the production and sale of our first two, recently certified, R1S vehicles. As of December 15, 2021, we had approximately 71,000 R1 preorders in the United States and Canada from customers who each paid a cancellable and fully refundable deposit of $1,000.

***

> We intend to expand our operations significantly, which will require hiring, retaining and training new personnel, controlling expenses, establishing facilities and experience centers, and implementing administrative infrastructure, systems, and processes. For example, we currently plan to expand our manufacturing and supply chain operations into international markets, and we are planning to build a second manufacturing plant in Georgia beginning in the summer of 2022.

89.    On the same day, in a conference call with financial analysts and investors regarding Rivian's reported third-quarter financial results, Defendant Scaringe represented that the Company was ramping up production and that any supply-chain issues would be short-term. Scaringe stated that while the Company expected to "to produce a few hundred vehicles short of our initial 1,200 vehicle production target,… ***[o]ur production ramp of the R1T, R1S, EDV 700 and EDV 500 will continue into next year.  And we remain confident in our long-term manufacturing trajectory.***"

90.    Scaringe assured that the Company was not facing any long-term, systemic issues with its supply chain:

> ***The good news is we do not believe any of our supply chain challenges represent long-term systemic issues.*** While our product development and manufacturing teams have been focused on ramping our normal production facility, our real estate and facilities team have been working diligently to ensure we remain well-positioned to capture and drive the accelerated large-scale adoption of sustainable transportation.

91.    To the contrary, Defendant Scaringe represented that that the Company's supply chain issues were "short-term in nature, and they are solvable problems," because "we've added so much capacity over the last couple of months," and that Rivian would satisfy customer preorders of its vehicles:

> With the growing backlog of 71,000 preorders and our 100,000 unit order from Amazon, we are excited to begin to satisfy the tremendous demand for our products and services. Our team has rallied around their shared values and continue to demonstrate a tireless work ethic as we continue scaling our production volumes.

92.    On the conference call, CFO McDonough described supply chain issues as temporary and represented that the Company was working to build up its "inventory balance to help mitigate the supply chain challenges we have experienced today."

93.    On the December 16, 2021 earnings call, Defendant McDonough also stated that high fixed costs "amortized over a small but growing number of vehicles" would cause negative gross profits. However, this statement only disclosed one factor causing losses while omitting that material costs significantly exceeded retail prices.

-22-

94.    Through this statement, investors were led to believe that scaling production and amortizing fixed costs over more vehicles were the key to achieving profitability when in fact the fundamental problem was that each vehicle was sold at a loss even before considering fixed costs.

95.    On the same call, when analysts asked about pricing, Defendant Scaringe attributed the Company's pricing review to "inflation" and "very strong demand." However, the vehicles had been underpriced since at least 2019, well before the 2021 inflationary environment, and management knew since at least 2019 that prices would need to be increased in order to achieve profitability.

**G.    Rivian Falls Short On Vehicle Production And Raises Prices**

96.    On January 10, 2022, Rivian announced it had only produced 1,015 vehicles in 2021 and delivered a mere 920 vehicles.

97.    On 

98.    On

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9      99.    A
10
11
12
13
14
15
16
17
18
19
20     100.    Another
21
22
23
24
25
26
27     101.    To
28



VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

102.    Another

103.    On March 1, 2022, less than two months after announcing its low production and delivery rates, Rivian announced that it was raising the prices on the R1T pickup and R1S SUV by 17 percent and 20 percent, respectively, and that the new prices would apply to nearly all preorders. The base price for an R1T was raised by $12,000, from $67,500 to $79,500, and the R1S jumped by around $14,000, from close to $70,000 to $84,000.

104.    In an emailed statement, Rivian's Chief Growth Officer Behl blamed inflation, supply chain issues, and component price increases:

> Like most manufacturers, Rivian is being confronted with inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips).
>
> ***
>
> This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today—prices which were originally set in 2018.

105.    A subsequent emailed statement to customers who pre-ordered Rivian vehicles informed them that they would be forced to pay $6,000 more for a larger battery pack, that the car would only be available in a seven-seat configuration, and that the Company was charging higher prices for the vehicles they pre-ordered

106.    An article published on *Electrek*, a news website dedicated to electric transportation and sustainable energy, explained that customers were left with the choice of "either accept[ing] a significantly lower spec vehicle that won't arrive until 2024 at the earliest or pay[ing] much much

more for the reservation you already made. Neither choice sounds great." Indeed, customers canceled their preorders in droves after the Company's announcement. A poll at the time, showed that of 3,200 respondents, 1,700 were canceling their orders immediately and another 1,100 were "still deciding" if they should cancel. As one R1S preorder customer pointed out:

> *A [$17,000] increase is not inflation - it means it wasn't priced appropriately to begin with.* Add in the new 'option' for a dual motor which is positioned as a great new option but in reality it just means they are now charging you more for the quad motor which was previously the only option. This feels like a gigantic bait and switch.

107.     Evidence from former Rivian employees, included in a securities class action lawsuit against the Company and certain of its directors and officers (*see* §V.K.1 *infra*) further confirms that the Individual Defendants knew about the severe underpricing problem well before the IPO and deliberately concealed this information from investors.

**H.     Market Reaction To Price Increase Announcement**

108.     Following the March 1, 2022 announcement of the price increases and news of customer defections, Rivian's stock price fell $8.35 per share, or more than 13%, from $61.91 per share on March 1, 2022, to close at $53.56 per share on March 2, 2022.

109.     On March 3, 2022, Defendant Scaringe, in an open letter to customers, walked back the price hikes for preorders made before March 1, 2022, and admitted the Company's pricing strategy was flawed at its inception:

> Earlier this week, we announced pricing increases that broke the trust we have worked to build with you.

***

> As we worked to update pricing to reflect these cost increases, we wrongly decided to make these changes apply to all future deliveries, including pre-existing configured preorders. *We failed to appreciate how you viewed your configuration as price locked, and we wrongly assumed the announced Dual-Motor and Standard battery pack would provide configurations that would deliver price points similar to your original configuration.* *While this was the logic, it was wrong, and we broke your trust in Rivian.*

> We also didn't manage communications well. We didn't give you enough insight into what was driving these decisions.  The most important aspect of what we are building is our relationship with all of you. As we demonstrated earlier this week, trust is hard to build and easy to break. In speaking with many of you over the last two days, I fully realize and acknowledge how upset many of you felt. I have made a lot of mistakes since starting Rivian more than 12 years ago, but this one has been

-26-

the most painful.… We made a mistake in how we approached our pricing changes[.]

***

**For anyone with a Rivian preorder as of the March 1 pricing announcement, your original configured price will be honored. If you canceled your preorder on or after March 1 and would like to reinstate it, we will restore your original configuration, pricing and delivery timing.**

(Emphasis in original).

110.    An RBC Capital Markets analyst predicted that the pricing roll-back would cost the Company around $850 million in revenue and that the higher prices going forward would make it harder for Rivian to attract new customers. The analyst also noted that "the thesis had been that Rivian could sell whatever it could make, but there may now be some more holes in that," indicating concern about demand destruction from the pricing fiasco.

111.    On March 3, 2022, following Defendant Scaringe's open letter walking back the price hikes for existing preorders, Rivian shares fell an additional $2.65 per share, or approximately 5%, from $53.56 per share on March 2, 2022, to close at $50.91 per share on March 3, 2022.

112.    Between March 2-10, 2022, the stock continued to decline to $41.16 per share as analysts digested the financial implications of the pricing debacle and the Company's inability to achieve profitability on its vehicles.

113.    On ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

### I.    Analyst Commentary Regarding The True Nature Of The Problem

114.    Financial analysts immediately recognized that the pricing problem revealed that Rivian's vehicles had been fundamentally underpriced from the outset, not merely impacted by recent inflation or supply chain issues, reflecting a fundamental lack of internal controls at Rivian.

115.    On March 9, 2022, Deutsche Bank analysts noted: "We believe RIVN required a $12-$14k price increase in order to achieve their prior financial targets." This analysis demonstrated that the market understood the price increase was necessary to achieve profitability, not merely a response to temporary inflation.

116.    J.P. Morgan analysts stated that the price rollback implied "lower gross profit margin for the first nearly 83,000 units delivered" and "some demand destruction" for future reservations. This analysis showed that the market understood Rivian would be forced to sell tens of thousands of vehicles at a loss.

117.    Deutsche Bank characterized the results as reflecting "steep cost pressures from input costs in the current inflationary environment, which it cannot offset with pricing following the backlash around its proposed price increase." This analysis revealed the Company's dilemma: it needed to raise prices to avoid losses, but could not do so without massive customer defections.

118.    Multiple customers and industry observers immediately recognized that the magnitude of the price increase revealed fundamental mispricing rather than inflation. As one R1S preorder customer stated: "A [$]17[,000] increase is not inflation - it means it wasn't priced appropriately to begin with."

**J.    Rivian Reports Substantial Losses**

119.    In a letter to shareholders attached to a Current Report on Form 8-K filed with the SEC on March 10, 2022, the Company disclosed poor financial results for the fourth quarter, including revenue of $54 million, well below earlier projected revenue of $64 million, and negative gross profit of $383 million. The Company announced it expected to produce only 25,000 vehicles in 2022, despite having the capacity to build 50,000 vehicles with its current facilities, citing "supply chain constraints."  GAAP net loss for the fourth quarter was $2.45 billion, or $4.83 per share, compared to a loss of $353 million, or $3.50 per share for the same period one year earlier. Further, the Company's projected adjusted EBITDA for full year 2022 was a mere ($4,750 million) and the Company reported that it would continue to face negative gross margins in fiscal 2022 due in part to the need to "minimize price increases to customers in the near term." J.P. Morgan emphasized that the Company's price reverse on reservations prior to March 1 would result in "lower gross profit margin for the first nearly 83,000 units delivered" and would cause lower demand for Rivian vehicles in the long term because the material price hikes would still apply for future reservations.

120.    Following the release of the fourth-quarter financial results, Rivian's stock fell another 7.5%, from $41.16 per share on March 10, 2022, to close at $38.05 per share on March 11, 2022.

121.    On



122.    On March 31, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K").[5] The 2021 10-K confirmed that Rivian continued to suffer from material weaknesses in its internal controls:

> The material weaknesses previously identified pertained to controls to address segregation of duties across financially relevant functions and IT general controls over our Enterprise Resource Planning systems, applications, and tools used in financial reporting. We have concluded that these material weaknesses continue to exist as of December 31, 2021.

123.    On

---

[5] The 2021 10-K was signed by Defendants Scaringe, McDonough, Boone, Schwarts, Marcario, Krawiec, Flatley and Thomas-Graham. Defendant Scaringe certified pursuant to the Sarbanes-Oxley Act of 2002 that the Annual Report fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

**K.**      **Rivian Is Sued In A Securities Class Action Lawsuit**

124.    After Rivian's stock price spiraled downward as it disclosed the truth regarding its operational losses and other issues, on March 7, 2022, securities class action lawsuits began to be filed against Rivian and certain of its directors and officers in the United States District Court for the Central District of California, consolidated under the caption *Crews v. Rivian Automotive, Inc., et al.*, No. 2:22-cv-01524-JLS-E (C.D. Cal.) (the "Securities Class Action", asserting claims on behalf of a class of purchasers of Rivian stock between November 10, 2021, and March 10, 2022, inclusive.

125.    The Securities Class Action charges the Company, Defendants Scaringe and McDonough, and Jeffrey R. Baker, Rivian's Chief Accounting Officer ("CAO"), with violations of Sections 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act"). The Lead Plaintiff also asserts claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against Rivian, Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Flatley, Thomas-Graham, and Krawiec and CAO Baker, as well as other claims against the underwriters of Rivian's IPO.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

### 1. Confidential witnesses in the Securities Class Action[6] confirm Rivian's knowledge that underpricing was causing substantial operating losses

126.     The Securities Class Action complaint includes detailed testimony from former Rivian employees that corroborates the allegations that the Individual Defendants had actual knowledge of the operational losses caused by underpricing well before the IPO.

**FE-3 - Finance Manager**

127.     A former Finance Manager at Rivian (referred to as "FE-3") worked in the Commercial Finance department from approximately March 2021 through November 2021. FE-3 had access to internal financial reports that tracked the negative margins on R1 vehicles.

128.     FE-3 had access to an internal "Revenue and Margins Report" prepared by Finance Manager Eric Socia. This report used forecasting data from Adaptive Insights and was integrated into Tableau reports that were accessible to executives.

129.     FE-3 attended meetings in Fall 2021 where this Revenue and Margins Report was presented to the Commercial Finance team. These presentations showed that Rivian would continue to operate at negative gross margins on R1 vehicles at the then-current pricing.

**FE-4 and FE-5 - Cost Engineers**

130.     Two former members of Rivian's Cost Engineering Group (referred to as "FE-4" and "FE-5") confirmed that senior management had detailed knowledge of the bill of materials costs that far exceeded retail prices.

131.     Both FE-4 and FE-5 were members of the Cost Engineering Group, which was responsible for determining bill of materials costs for Rivian's vehicles. They had access to "Project X," a database that tracked all R1 Platform material costs.

132.     FE-4 stated that executives, including Defendant Scaringe, had access to Project X and could view the detailed material costs that exceeded the retail prices of the Company's vehicles.

---

[6] While Plaintiff and his undersigned attorneys conducted their own independent investigation of the wrongdoings alleged herein, the Former Employee ("FE") allegations herein are based solely upon the Securities Class Action complaint. Regardless of gender, all FEs will be described in the masculine as in the Securities Class Action complaint.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

133.     FE-5 attended the December 2019 meeting with CFO Ryan Green and Finance Director where the 20-30% understatement in the consultant's cost estimates was revealed. This meeting demonstrated that senior management knew as early as December 2019 that the vehicles were severely underpriced.

134.     According to both FE-4 and FE-5, by September 2021, all parts had been sourced and material costs were locked in through purchase orders with suppliers. At this point, management knew with certainty that bill of materials costs were at least $110,000, far exceeding the retail prices of the Company's vehicles.

### 2.  The Court denies defendants' motions to dismiss the Securities Class Action

135.     On March 7, 2022, the Court denied motions to dismiss the Securities Class Action complaint filed by Rivian and the named directors and officers and by the underwriters of Rivian's IPO. *Securities Class Action*, ECF No. 172. The Court held, *inter alia*, that (i) the Securities Class Action alleged "sufficiently detailed factual allegations to show that Rivian had been struggling with bringing BOM costs down for years before the IPO, without success (*id.* at 18); (ii) the alleged facts were sufficient to "show that the risk of increasing material costs was not a mere possibility . . . but an issue that had already come to fruition" (*id.* at 19); (iii) Rivian misled investors by misidentifying and obscuring the key facts that would ensure Rivian's continuing negative gross profits absent price increases (*id.* at 21); and (iv) that certain allegations pled if proven would "establish that raising R1 EV retail prices was inevitable, and the inevitability of price increases was clear to Rivian before the IPO" (*id.* at 26). Therefore, the Court held that the falsity regarding several statements was well pled. *See, e.g.*, *id.* at 26. The Court further held that a strong inference of scienter was raised because, among other reasons, it was "simply not credible that Rivian senior executives would be unaware of the "upside down" pricing structure of Rivian's flagship EVs leading up and in the months after the IPO." *Id.* at 28-29. The Court also held that claims for violation of Section 20(a) of the Exchange Act and Sections 11, 12 (a) and 15 of the Securities Act were well pled. *Id.* at 29-35.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

### 3. The Securities Class Action settles for $250 million

136.    On October 23, 2025, the parties in the Securities Class Action action filed a motion for the preliminary approval of a $250 million settlement (ECF No. 750). The release in the Stipulation and Agreement of Settlement (*id.*, ECF No. 750-3) explicitly carves out the claims alleged in another securities action captioned *Indiana Public Retirement System v. Rivian Automotive, Inc. et al*, No. 2:24-cv-04566-CBM-PVC (C.D. Cal.) ("*IPRS*"). *See* §V.Q, *infra*. On December 18, 2025, the Court granted the motion for preliminary approval of the *Crews* Securities Class Action settlement (*id.*, ECF No. 758).

### L.    The Board Ignored Red Flags Regarding Operational Issues And Underpricing

137.    On November 4, 2021, Schwab, the former Vice President of Sales and Marketing at Rivian, filed a wrongful termination lawsuit[7] against the Company, alleging that she was subject to a toxic work environment and gender discrimination.

138.    Beginning in the Spring of 2021, Schwab began raising concerns about Rivian's underpriced vehicles, unrealistic manufacturing and delivery deadlines, and its ability to "deliver on its promises to investors,"[8] but no one listened. Her concerns about "Rivian's misleading public statements and flawed business practices" were dismissed.[9] Schwab was also concerned about the refinement of Rivian's manufacturing process which could impede vehicle quality and safety. Her concerns were again dismissed.

139.    Schwab consistently raised operational issues with management during her time at the Company, but the Board neither investigated nor took action in response to her concerns.  Among other things, she warned that:

- Rivian's vehicles were underpriced and that "each sale would result in a loss [to] the company," raising this issue with several executives at the Company, including Behl,

---

[7]    *Schwab v. Rivian Automotive, Inc., et al.*, No. 30-2021-01229809-CU-OE-CJC (Cal. Sup. Ct.), ECF No. 2. After filing her complaint, the action was stayed pending resolution of the arbitration proceedings in front of the American Arbitration Association. Schwab filed for a dismissal of the action without prejudice on May 27, 2022, which was granted the same day.

[8]    Schwab Compl. at ¶ 17.

[9]    *Id.* at ¶3.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

her immediate superior, but was ignored. When a male executive mentioned this issue again, Behl admitted that the Company would need to raise prices ***after the IPO***.[10]

- Rivian's manufacturing process was not sufficiently refined to ensure vehicle safety, integrity, and quality.[11]

- "[T]he publicly announced dates for manufacturing and delivery were not achievable." In Sales and Operations planning meetings in September 2021, Schwab said that "the company should set a realistic objective."[12]

- Rivian's use of a third-party vendor would add substantial expense. Her concerns were dismissed, which led to the events going over budget and the cancellation of subsequent events.[13]

140. As detailed above, the evidence demonstrates that the Board ignored many red flags exhibiting the Company's internal operational issues and severe vehicle underpricing quagmire. The Board utterly failed to take timely action to address these issues and utterly failed to implement controls regarding disclosure to ensure that these material issues were timely disclosed to investors. Indeed, ██████████████████████████████████████████████████████████████ ████████████████████

141. The red flags, include: (1) ████████████████████████████████ ██████████████████████████████████████████ (2) the December 2019 CFO meeting revealing 20-30% cost understatement; (3) ongoing Cost Engineering Group reports showing costs exceeding $100,000; (4) the Project X database tracking material costs; (5) Revenue and Margins Reports showing negative gross margins; (6) Schwab's repeated warnings to multiple executives beginning in Spring 2021; (7) Schwab's work with Finance Director Lucey on loss projections in Fall 2021; (7) Behl's admission that prices would need to increase after the IPO; and (8) Schwab's publicly-filed lawsuit filed November 4, 2021.

142. On November 10, 2021 (the day of the IPO), Defendant Scaringe publicly disputed Schwab's claims. Rather than investigating her serious allegations about underpricing and operational issues, the Board allowed management to dismiss these concerns publicly, even though the Board had access to information confirming that Schwab's concerns about underpricing were accurate.

---

[10]  *Id.* at ¶28.

[11]  *Id.* at ¶29.

[12]  *Id.* at ¶30.

[13]  *Id.* at ¶31.

143.    These red flags were not only raised internally by an experienced automotive executive, and through several internal tracking processes, but also externally by experienced securities investment analysts who warned early on that Rivian could not produce vehicles at expected rates and would have difficulty scaling in a low-margin business. For example, New Constructs, an equity research firm, in a report published on November 4, 2021, addressed the substantial risks caused by delays in delivering vehicles by noting the impact production delays previously had on other vehicle manufacturers:

> We know from Tesla's early days (filled with setbacks and delays) that it takes years to develop scale and manufacturing capabilities to routinely deliver a large number of quality vehicles on time. Rivian, despite investments from Ford that could help alleviate some early growing pains, has already delayed delivery of its flagship vehicles. Any further delays could make some of the company's pre-ordering customers, which total ~54,000 as of October 31 for its passenger vehicles, look elsewhere. For comparison, Ford announced in October 2021 that it had over 160,000 reservations for its F-150 Lightning.

144.    The Board ignored the red flags. If the Board had taken timely action, the damage to Rivian could have been prevented or at least minimized.

## M.    The Company Continues To Misrepresent Its Operational Capabilities

145.    On August 11, 2022, the Company filed with the SEC its Form 10-Q reporting its second quarter financial results, which was signed by Defendants Scaringe and McDonough. The 10-Q represented that there was a "strong" and "increasing demand" for Rivian vehicles. Rivian also filed a Current Report on Form 8-K that day and attached its Q2 2022 Shareholder Letter as an exhibit thereto. In the letter, the Company emphasized the need to ramp up production to meet "strong demand" for its products: "We remain focused on fully ramping our 150,000 installed annual units of capacity to support the rapid scaling of R1 and EDV production. Our net consumer preorder backlog as of June 30, 2022, was approximately 98,000, and momentum continues to increase."

146.    On a conference call with financial analysts and investors to discuss the second quarter financial results, Defendant Scaringe emphasized that Rivian had about 98,000 net preorders for the R1 platform and stated that there was "continued strong demand" for products and that the daily preorder rate had accelerated. Scaringe added that the Company remained focused on ramping

-35-

production at its Normal, Illinois facility to reach 150,000 units of annual capacity and characterized the strong order book as evidence of robust demand.

147.    When asked about the Company's plan to achieve "positive gross margin" Defendant McDonough outlined a path to positive gross profit and gross margin by 2024, explaining that the most significant driver would be ramping production volumes to leverage fixed manufacturing costs, with additional improvements from introducing next-generation technologies and moving away from low-priced early preorders:

> I wanted to hit on your first question *in terms of what that path to positive gross profit and positive unit economics looks like for Rivian in particular.* As you called out, right, we have seen unprecedented levels of inflation, especially across our raw material inputs and lithium prices that have gone up north of 115% over – since the start of this year, in particular, coupled with COVID and other factors that have driven a challenging supply chain and inflationary environment as well as part of that. But as we look out to the future, as I mentioned in my prepared remarks, *we have significant confidence in the long-term gross profit margin targets that we've set out for ourselves of approximately 25%.* And I will give you a little bit of that path as we see from today going from our current state to that future state of positive unit economics. We see 2024 as really that pivotal year for us in driving a step change in terms of the underlying gross margin expectations within the business, as we have a couple of significant factors that are starting to impact our underlying unit economics. *First and foremost, it's really driven by us ramping our plants and our productivity within our 150,000 units of installed capacity within Normal that allows us to really leverage all of those fixed overhead and costs associated with our large-scale production facility.*
>
> Second, it's also our ability to introduce our next-generation technologies into our vehicles, first in our R1 products as well as in our EDVs. So those are things like in-sourcing of our motors, the introduction of our LFP pack, which will be introduced first in our commercial vehicles, that allow us to really drive a step change in terms of vehicle performance in that time frame, which enables us to increase pricing on the vehicles, given the fact we will have vehicles with added range and added performance and capabilities, but they also importantly drive significant cost-downs within our bill of materials as we look at that roadmap ahead.
>
> And then finally, the other core factor as we think about that step-stone from a gross profit perspective is also really the anniversarying or moving beyond those pre-March 1 pre-orders as well that allow us to move into our current ASPs. And as we reiterated our last earnings call, we have seen $93,000 plus ASPs with the preorders that we have had post pricing change.

148.    On November 9, 2022, following the release of its third quarter financial results and the filing of its Quarterly Report, which was signed by Defendants Scaringe and McDonough, the Company filed with the SEC a Current Report on Form 8-K attaching its Q3 2022 Shareholder Letter

as an exhibit. The letter described Rivian's order backlog as "robust" and stated that strong demand

for the R1S and R1T provided clear visibility into future sales:

> Over the recent months, we achieved key operational and strategic milestones. Production continued to ramp on our R1 and RCV platform lines; we produced 7,363 total vehicles during the quarter representing a 67% increase as compared to the second quarter of 2022. ***We recently initiated our second manufacturing shift and remain focused on ramping production to meet the strong demand for our products.*** As we navigate through these uncertain economic times, ***we are encouraged by the strong demand for our products as evidenced by our robust preorder backlog.***

149.    On a conference call with financial analysts and investors to discuss the third quarter

financial results, Defendant McDonough announced that Rivian would no longer be publicly

reporting its backlog figures, closing an avenue for investors to assess demand, and represented that

the Company had visibility into demand based on several metrics. McDonough again stated that

ramping production was the largest lever (about two-thirds) in the Company's roadmap to achieve

positive gross margins in 2024, with the remainder driven by other factors, such as higher average

selling prices, next-generation technologies, and material cost reduction efforts:

> [A]s we've talked about in the past, we expect to see a material step change in gross margin in that walk from current state to that 2024-time frame. ***And the biggest lever, not surprisingly, is really that fixed cost leverage*** as well as our opportunity to move beyond some of the start-up-related costs that you heard [Scaringe] and myself talk a bit about that we've already seen from a process perspective, Q3 versus Q2. ***That reflects about two-thirds of the margin walk. So just wanted to make sure that you had a sense for just the magnitude of how important ramp is from an overall unit economic perspective.***

> The second key driver for us is associated with pricing. As we've talked about in the past, the post-March 1 configured preorders that we have in our order book reflect a $93,000 average ASP. And we've got a lot of really exciting next-generation technologies that will be coming into the fold as well that allows us to believe that, that ASP could even drive meaningfully higher on a go-forward basis as well. So that's the second core lever in that economic walk.

> And then finally, last but certainly not least, is really all of the core focus and work that we're doing right now around the reduction of our bill of materials. So importantly, the engineering and design changes and the road map we have in place to drive meaningful cost savings within that bill of materials over the next couple of years.

> And then finally, all of the work that our procurement teams are doing around commercial cost-down opportunities as we continue to scale the business and importantly, work hand-in-hand with our supply chain partners and as Rivian continues to grow out its own manufacturing capacity and drive better unit economics for the business.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

150.    On November 29, 2022, at the Redburn CEO Conference, Defendant Scaringe told attendees that demand was "foundational" to Rivian's business and that the Company had "a very clear line of sight through 2024" in terms of demand. He also represented that the backlog continued to grow and that Rivian monitored order rates closely:

> It's foundational to the business to make sure that demand continues to exceed our production capacity. What we've been challenged with, really, over the last year *that we've had such a large and growing demand backlog* that managing customer expectations and making sure we're communicating appropriately to customers, some of which were going to be in the backlog or a line for over 2 years. That's been a really core focus. And as we sit here today, *we have a very clear line of sight through 2024 in terms of demand, so we feel very confident about that, and we continue to see – and we talked about this on our last earnings call, we continue to see our backlog grow even as we're ramping deliveries.*

151.    On February 28, 2023, the Company filed with the SEC its Annual Report on Form 10-K for fiscal 2022 (the "2022 10-K"), signed by Defendants Scaringe, McDonough, Boone, Schwartz, Marcario, Krawiec, Flatley and Thomas-Graham.  In previous Forms 10-Ks, the Company included a boilerplate risk disclosure regarding the Company's ability to assess customer demand. However, in the 2022 10-K, in stark contrast to Defendants Scaringe and McDonough's previous representations about the "strong demand" which the Company had "clear visibility" into, Rivian made the following risk disclosure:

> Our ability to become profitable in the future will depend on the continued successful development and commercial production and acceptance of our vehicles and services, our ability to maintain strong demand and average selling prices for our vehicles, as well as our capability to manufacture our vehicle portfolio efficiently and estimate and effectively manage both our operating expenditures and our capital expenditures.

152.    Further, the same day, Rivian held a conference call with financial analysts and investors to discuss the fourth quarter and full year financial results. On the call, Defendant Scaringe reiterated that the backlog of products gave Rivian "clear visibility" into demand for its vehicles "well into 2024" which supported Rivian's aggressive production ramp to help it achieve positive gross margins: "In the fourth quarter, we increased production over 10,000 units. This represents a 36% increase over the third quarter of 2022. *We maintain a vehicle backlog that provides clear demand visibility well into 2024.*"

-38-

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

153.    McDonough confirmed that the roadmap to positive gross profit and gross margin relied primarily on higher production volumes, which she said accounted for about two-thirds of the expected improvement:

> We forecast reaching positive gross profit in 2024 and therefore expect by the end of 2024, we will no longer have material LCNRV [lower of cost or net realizable value] inventory charges and losses on firm purchase commitments associated with the production at our Normal plant.
>
> ***
>
> ***The most significant driver continues to be our production levels. The largest lever in our forecast is the swing from negative $1 billion of gross profit in Q4 2022 to a step change in positive gross margin in 2024.***
>
> ***[T]he most impactful driver is the per-unit reduction of labor overhead and ramp expenses as our large-scale plant produces a greater number of units.*** With the addition of our second shift, the plant in Normal is currently staffed to produce a significantly higher number of units than our current run rate. For context, these expenses represent 2/3 of the bridge from our current COGS per unit to what we expect by the end of 2024.

154.    While Defendant McDonough noted that the Company would have "the impact of both a "multi-week shutdown" of the Normal facility in 2024 to ramp up production and the introduction of "a number of the next generation technologies," she touted the Company's production ramp which would help Rivian achieve gross margin profitability:

> [W]e're increasing that capacity so that 55% or call it, 85,000 units will become R1 capacity as we re-rate the lines midyear next year.
>
> ***
>
> And so we'll still be in a period whereby we'll be continuing to ramp out of that shutdown in midyear to produce more units in the back half of the year but it really won't be until full year 2025, where we'll be ramping up the then re-rated capacity from an R1 perspective.

155.    McDonough also confirmed that the Company would have "85,000 units of R1 capacity" available for 2024.

156.    Defendant Scaringe later doubled down on the Company's "clear line of sight until well into 2024" for demand based on the backlog which was "very robust" and brushed aside any impact on that demand from macroeconomic factors.

157.    On April 4, 2023 at a Bank of America Automotive conference, Defendant McDonough repeated to a financial analyst that roughly two-thirds of the progress toward positive

gross profit would come from fixed-cost leverage achieved through greater production volume, with the remaining one-third from material-cost reductions and pricing. McDonough stressed that increasing production was the primary lever to achieve profitability.

158.    On May 9, 2023, Rivian filed with the SEC a Current Report on Form 8-K, attaching a shareholder letter for Q1 2023. The letter stated that increasing production volume is the "primary lever" to Rivian's path to selling each vehicle profitably. It explained that more than half of the improvement needed to reach positive gross profit per vehicle would come from higher volume, with the rest coming from reductions in bill-of-materials cost and increased average selling price:

> ***Increasing our production volume*** as we simultaneously leverage our fixed costs at our manufacturing plant in Normal, Illinois ***is the primary lever on our path to sell each vehicle profitably***. Our 2023 production guidance of 50,000 vehicles remains on track, representing a 100% increase from 2022. While challenges remain, we have become a stronger, more agile company through this process.

> \*\*\*

> Our long-term success as a business will be determined by our ability to produce high volumes of vehicles profitably. The collective efforts across all our teams and functions are focused on delivering on this goal. Our target of generating positive gross profit in 2024 is composed of several drivers across the business. ***We expect approximately half of the improvement, excluding the impact of lower of cost or net realizable value ("LCNRV") and net losses on firm purchase commitments, will be driven by greater volume.*** Our 2023 production guidance of 50,000 units implies a doubling of capacity utilization which we believe will result in significantly lower fixed cost per vehicle, and we expect production volumes to increase further in 2024. The remaining half is split between material cost reduction and increases in average selling prices.

159.    The Company's Quarterly Report filed that day contained the same risk disclosure statement as the 2022 10-K regarding the Company's ability to continue "successful development and commercial production" and meet demand.

160.    On a conference call with financial analysts and investors to discuss Rivian's first quarter 2023 financial results held on May 9, 2023, Defendant Scaringe confirmed that the Company's "progress" on "our core value drivers of ramping production, driving costs down . . . . positions us well to continue executing on our goals for the remainder of the year as well as into 2024." McDonough noted that Rivian continued "to target positive gross profit in 2024" with "approximately half of the improvement" driven by "greater volume and utilization of our installed capacity." She also represented that production volumes would increase further in 2024: "Our *2023*

production guidance of 50,000 units implies a doubling of capacity utilization, which will result in significantly lower fixed cost per vehicle, and ***we expect production volumes to increase further in 2024***."

161.    On June 2, 2023, at the Bernstein Strategic Decisions Conference, Defendant Scaringe reiterated that the largest driver toward a healthy gross-margin structure was production volume and estimated that volume accounted for about half of the path to profitability, with the remainder from higher average selling prices and reductions in the bill of materials. Scaringe represented that Rivian monitored demand daily and that demand remained strong, noting that the backlog continued to be significant even as production increased. He also noted that while the Company paid attention to backlog figures, it paid even closer attention to "cancellation rates" which were also not reported publicly.

162.    On June 15, 2023, at the Deutsche Bank Global Auto Industry Conference, Defendant McDonough stated that Rivian's order backlog remained "very robust" and extended into 2024, described the demand environment as stable, and assured investors that the Company was well positioned to achieve its profitability roadmap.

163.    On August 8, 2023, Rivian filed with the SEC a Current Report on Form 8-K, attaching a shareholder letter for Q2 2023. The letter described increasing production as the primary lever to achieve positive gross profit. Executives said the company had clear visibility into demand deep into 2024 and that the backlog remained strong. A Quarterly Report filed with the SEC that day contained the same risk disclosure as the 1Q23 10-Q and the 2022 10-K.

164.    On a conference call with financial analysts and investors the same day, Scaringe said they were "quite bullish" on strong demand and that the backlog provided clear visibility into sales well into 2024. McDonough reiterated that ramping production was the single largest driver of the path to positive gross profit.

165.    On September 7, 2023, at the Goldman Sachs Communacopia + Technology Conference, Defendant McDonough stated that ramping production volumes within Rivian's Normal production facility was "the single largest driver" of the path to positive gross profit. In response to a question about customer demand, McDonough stated that the backlog was "holding up well" and that

production volumes were beginning to mirror the backlog composition. She noted that long wait times were the biggest reason customers canceled orders and that Rivian was excited to work through the backlog.

166.    On September 14, 2023, at the Morgan Stanley 11th Annual Laguna Conference, Defendant Scaringe confirmed that demand for Rivian vehicles remained "very strong" with a large backlog and noted that the Company was still focused on "ramping production." As an example, Scaringe noted that if a customer ordered an R1S on that date, they would not receive the vehicle until the end of the following year, calling it a "high-class problem" for the Company.

167.    On November 7, 2023, Rivian filed with the SEC a Quarterly Report on Form 10-Q, which contained the same risk disclosure as previous quarterly reports. On a conference call with financial analysts and investors, Defendant Scaringe reaffirmed Rivian's roadmap to positive gross margins in 2024, saying that the major levers were continued ramp-up of production (and the resulting fixed-cost absorption), significant reductions in bill-of-materials costs through supplier negotiations and design changes, and growth in average selling price.

### N.    Rivian's False And Misleading Proxy Statement

168.    On May 1, 2023, the Company filed its 2023 Proxy Statement with the SEC, soliciting shareholder votes to, among other things, re-elect Defendants Boone and Marcario to the Board and approve executive compensation. The Proxy Statement was issued by order of the Board and signed by Defendant Scaringe.

169.    The 2023 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks we face. Throughout the year, senior management reviews these risks with the Board of Directors at regular Board of Directors meetings as part of management presentations that focus on particular business functions, operations, or strategies, and presents the steps taken by management to mitigate or eliminate such risks. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing

committees of the Board of Directors that address risks inherent in their respective areas of oversight

170.    The 2023 Proxy Statement represents that the Audit Committee is engaged in vigorous oversight over risks to the Company, the adequacy of the Company's internal controls, and compliance with all legal requirements: "[O]ur Audit Committee is responsible for overseeing our major financial risk and enterprise exposures and the steps our management has taken to mitigate such exposures, including the structure, design, adoption, and implementation of our risk management policies and internal control systems."

171.    The 2023 Proxy Statement represents that the Nominating and Corporate Governance Committee "manages risks associated with . . . governance matters."

172.    The foregoing statements in the 2023 Proxy Statement were false and misleading and omitted material information.  Contrary to the representations made in the Proxy Statement, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, including its production capabilities and ability to accurately price its vehicles; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

173.    On June 23, 2023, Rivian filed with the SEC a Current Report on Form 8-K announcing, among other things, the re-election of Defendants Boone and Marcario to the Board and the approval of executive compensation pursuant to the solicitations in the 2023 Proxy Statement.

**O.    Rivian Announces Flat 2024 Production Guidance**

174.    On February 21, 2024, Rivian filed with the SEC a Current Report on Form 8-K, attaching a 2023 shareholder letter.  In the letter, the Company issued dismal guidance for 2024 production, projecting production that would be *less* than the 57,332 electric vehicles produced in 2023: "We expect 2024 production to be flat year-over-year with total units of 57,000." This guidance also missed the Company's internal production target of 62,000 EVs. Based on this weak guidance, the Company was forced to revamp its production roadmap with new reduced goals:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- ~50% - Variable cost per unit: We anticipate the majority of these savings will be accomplished through the material cost reductions planned as part of our R1 engineering design changes, commercial supplier negotiations, and lower raw material costs.

- ~35% - Fixed/semi-fixed cost efficiencies: As part of our planned shutdown and the associated design changes and optimization initiatives, we expect to significantly reduce our fixed costs per vehicle delivered by the end of 2024. ***These initiatives include increasing our production line rate by 30%.*** We also expect our LCNRV and firm purchase commitments balance to provide a benefit to gross profit during 2024.

- ~15% - Non-vehicle revenue: With over 71,000 Rivians on the road, we have the opportunity for increased revenue in areas such as service, accessories, remarketing, finance, insurance, and other software enabled services. These revenue sources are core to our long-term margin targets, and we expect to continue to drive growth and efficiencies in these areas over the next few years.

175.    On a conference call with financial analysts and investors that day, Defendant Scaringe admitted that the demand previously touted as "very strong" and robust" had been impacted by macroeconomic trends, stating: "Our business is not immune to existing economic and geopolitical uncertainties, most notably the impact of historically high interest rates, ***which has negatively impact [sic] demand***. In this fluid environment, we appreciate the expressed interest in demand visibility from the investment community."

176.    Further, the Company raised additional capital through multiple debt offerings, including $1.3 billion in green convertible notes in March 2023 and $1.5 billion in October 2023, and secured a transformative $5.8 billion investment commitment from Volkswagen AG announced in June 2024, including an initial $1 billion convertible note. These capital infusions were necessary due to the Company's continued inability to achieve profitability despite representations that increasing production volume was the primary path to positive gross margins.

**P.    Rivian Is Sued In Another Securities Class Action Lawsuit**

177.    On May 31, 2024, another securities class action was filed against the Company, and Defendants Scaringe and McDonough, later captioned *Indiana Public Retirement System v. Rivian Automotive, Inc. et al*, No. 2:24-cv-04566-CBM-PVC (C.D. Cal.). On December 10, 2024, an amended complaint was filed on behalf of a class of purchasers of Rivian stock between August 11, 2022, and February 21, 2024, charging the defendants with violations of Section 10(b) of the Exchange Act and Rule 10-b5 promulgated thereunder and the officer defendants with violations of Section 20(a) of the Exchange Act. The Lead Plaintiff alleges, among other things, that defendants

falsely assured investors that Rivian was on track to achieve 2024 profitability through strong EV demand and increased production, while concealing weakening demand and adverse macroeconomic pressures. They allege further that when the truth emerged—that production declined further in 2024, demand evaporated, and Rivian's profit roadmap was no longer viable—the Company's stock price collapsed, wiping out billions in shareholder value. On August 20, 2025, the Court denied the defendants' motion to dismiss the amended complaint (*IPRS*, EC No. 76).

## VI.    DERIVATIVE AND DEMAND ALLEGATIONS

178.    Plaintiff brings this action derivatively and for the benefit of Rivian to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Rivian and violations of Section 14(a) of the Exchange Act, and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and to seek contribution for violations of Section 21D of the Exchange Act, as well as the aiding and abetting thereof.

179.    Rivian is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

180.    Plaintiff is, and has been at all relevant times, a stockholder of Rivian and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of Rivian in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

181.    On August 31, 2022, Plaintiff sent the Rivian Board a letter demanding that it take all necessary steps to investigate the breaches of fiduciary duties by its directors and officers and other violations of law, "remediate the Company's deficient internal controls, corporate governance practices, and toxic culture[,]" and take "legal action against those found responsible for Rivian's damages." A true and correct copy of Plaintiffs' August 31, 2022 demand letter (the "Demand") is attached hereto as Exhibit A.

182.    Upon receipt of the Demand, the Board had an affirmative duty under Delaware law to consider and act upon the Demand in accordance with their fiduciary duties of loyalty, care, and good faith.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

183.   As of the commencement of this action, the Board has not accepted the Demand, commenced an investigation, or taken remedial action to address the wrongdoing detailed in the Demand. Under Delaware law, the Board's failure to take action within a reasonable time constitutes a refusal of the Demand. More than three years have passed since service of the Demand, which is more than sufficient time for the Board to evaluate the Demand and take appropriate action. The Board's inaction, whether intentional or through abdication of its duties, constitutes a wrongful refusal.

184.   Because the Board has constructively and wrongfully refused the Demand, Plaintiff now commences this derivative action in order to protect the Company, rectify the wrongs detailed herein, and hold the wrongdoers accountable for the damage they caused Rivian.

185.   Prosecution of this action, independent of the current Board, is in the best interest of the Company.

186.   The wrongful acts complained of herein subject, and will continue to subject, Rivian to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

187.   Plaintiff has exhausted all reasonable efforts to obtain the actions Plaintiff desired from the Board. Accordingly, Plaintiff is entitled to commence and maintain this derivative action on behalf of Rivian.

## VII.   CLAIMS FOR RELIEF

**COUNT ONE**
**Against the Individual Defendants for**
**Violations of Section 14(A) of the Exchange Act**

188.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

189.   The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

190.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

191.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

192.     Under the direction of the Individual Defendants, the 2023 Proxy Statement was materially false and misleading and omitted material information by, among other things, misrepresenting that Rivian's Board: (1) implemented and maintained an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, including its production capabilities and ability to accurately price its vehicles; (2) effectively oversaw and monitored the material risks facing the Company; and (3) investigated and took action when presented with red flags regarding misconduct or the lack of internal controls.  Further, the 2023 Proxy Statements contained false and misleading statements related to risk and corporate governance oversight by the Board and the Audit Committee.

193.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting the foregoing material facts, the statements contained in the 2023 Proxy Statement was materially false and misleading and omitted material information.

194.    The false and misleading statements in, and information omitted from, the 2023 Proxy Statement were material to Rivian's shareholders in determining whether to, among other things, elect Defendants Boone and Marcario to the Board and approve executive compensation.

195.    The material misstatements and omissions in the 2023 Proxy Statement damaged the Company.

196.    Plaintiff, on behalf of Rivian, seeks relief for the damage inflicted upon the Company based on the misleading 2023 Proxy Statement in connection with the improper election of Defendants Boone and Marcario and the approval of executive compensation.

## COUNT TWO
### Against the Individual Defendants
### for Breach of Fiduciary Duties

197.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

198.    The Individual Defendants owed and owe fiduciary duties to Rivian. By reason of their fiduciary relationship, the Individual Defendants specifically owed and owe Rivian the highest obligation of good faith and loyalty in the administration of Rivian's affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Rivian alleged herein.

199.    The Individual Defendants ignored their obligations under state and federal law.  The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

200.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of Rivian in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Rivian's affairs and in the use and preservation of Rivian's assets.

201.   The Individual Defendants each violated their fiduciary duties to Rivian and its stockholders by, among other things: (1) failing to implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, including its production capabilities and ability to accurately price its vehicles; (2) failing to effectively oversee and monitor the material risks facing the Company; (3) failing to investigate and take action when presented with red flags regarding misconduct or the lack of internal controls; and (4) engaging in a scheme to conceal the Company's internal control and vehicle pricing and cost of materials failures in order to facilitate the capital raise through the IPO. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Rivian has sustained and continues to sustain significant damages, and its reputation has been irreparably damaged.

202.   The Individual Defendants further breached their fiduciary duties to Rivian by, *inter alia*, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings.

203.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Rivian has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damages include, among other things, the costs of defending and resolving the pending Securities Class Actions.

204.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT THREE**
**Against the Individual Defendants for**
**Contribution Under Section 21D of the Exchange Act**

205.   The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

206.   Rivian is named as a defendant in Securities Class Actions asserting claims under the federal securities laws. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Rivian is found liable for violating the federal

-49-

securities laws,[14] the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

207.    As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Rivian's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

208.    The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

209.    The Individual Defendants have damaged the Company and are liable to the Company for contribution.

**COUNT FOUR**
**Against the Individual Defendants**
**for Aiding and Abetting**

210.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

211.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

212.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful

---

[14] On October 23, 3025, the parties in the Securities Class Action filed a motion for the preliminary approval of  a $250 million settlement (ECF No. 750).

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

213.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

214.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

**COUNT FIVE**
**Derivative Claim for Unjust Enrichment Against**
**The Individual Defendants**

215.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

216.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Rivian, as a result of their compensation and director remuneration and the proceeds which they received as a result of their misstatements and material omissions, while breaching fiduciary duties owed to Rivian.

217.    Plaintiff, as a stockholder and representative of Rivian, seeks on behalf of the Company an order of this Court ordering the Individual Defendants to disgorge and furnish restitution to Rivian of all profits, benefits, and other compensation obtained by them for their wrongful conduct and fiduciary breaches.

218.    Plaintiff, on behalf of Rivian, has no adequate remedy at law.

**VIII.    PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Rivian and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants violated Sections 14(a) and 21D of the Exchange Act and the related Rules promulgated thereunder;

(c)    Declaring that the Individual Defendants have breached and aided and abetted the breach of their fiduciary duties to Rivian and its shareholders;

(d)     Directing the Company to take all necessary actions to implement and maintain an effective system of internal controls and meaningful Board oversight;

(e)     Determining and awarding to Rivian the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(f)     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(g)     Awarding Rivian restitution from the Individual Defendants, and each of them;

(h)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', consultants' and experts' fees, costs, and expenses; and

(i)     Granting such other and further relief as the Court may deem just and proper.

## IX.    JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: December 21, 2025

**WEISS LAW**

**OF COUNSEL:**

**WEISS LAW**
David C. Katz
Mark D. Smilow
305 Broadway, 7th Fl.
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
        msmilow@weisslawllp.com

Joshua M. Rubin
Jonathan Meer
4 Brighton Rd., Ste. 204
Clifton, NJ 07014
Email: jrubin@weisslawllp.com
        jmeer@weisslawllp.com

By:     _/s/ Joel E. Elkins_
Joel E. Elkins
1801 Century Park East, 24th Fl.
Los Angeles, CA 90067
Telephone:  (310) 208-2800
Facsimile:  (310) 209-2348

*Counsel for Plaintiff Barbara Wolfson*

-52-

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT